# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MAINE

| | |
|---|---|
| KEITH NUZZO and ANDREA NUZZO,<br><br>       Plaintiffs,<br><br>v.<br><br>EXACTECH, INC. and EXACTECH, US, INC.<br><br>       Defendants. | Civil Action No.: _____<br><br>COMPLAINT & DEMAND FOR JURY TRIAL |

NOW COMES Plaintiffs Keith Nuzzo ("Plaintiff") and Andrea Nuzzo (hereafter collectively as "Plaintiffs"), by and through the undersigned attorneys, and bring this action against Exactech, Inc. ("Exactech") and Exactech US, Inc. ("Exactech US") (hereafter collectively as "Defendants"), for personal injuries suffered as a proximate result of Plaintiff's use of an Optetrak Comprehensive Total Knee System (hereafter as "Optetrak Device"). and allege as follows:

## NATURE OF THE ACTION

1.      This is an action for damages relating to Defendants' development, designing, testing, assembling, manufacturing, packaging, monitoring, labeling, preparing, distribution, marketing, supplying, and/or selling of the Optetrak Device.

2.      Thousands of patients, like Plaintiff Keith Nuzzo, have been, and/or will be, required to undergo extensive revision surgery to remove and replace defective Optetrak Devices. These revision surgeries have been necessitated, in part, by severe pain, swelling, and instability in the knee and leg caused by the device's propensity to undergo substantial early polyethylene

wear, component loosening and/or other failures causing serious complications including tissue damage, osteolysis, and other injuries as well as the need for revision surgery in patients.

3.     Recipients of the Optetrak Device have been required to undergo revision surgeries well before the estimated life expectancy of the Optetrak Device and at a much higher rate than should reasonably be expected for devices of this kind.

4.     Patients implanted with Optetrak Device have also experienced infection, fracture, and other significant and permanent damage to tissue, bones and nerves following revision surgery.

5.     Defendants concealed, and continue to conceal, their knowledge of the Optetrak Device's unreasonably dangerous risks, including an increased risk of early failure, from Plaintiff, Plaintiff's medical providers, other consumers, and the medical community at large.

6.     Despite knowledge that the Optetrak Device was defective and resulted in premature failures and accompanying complications, Defendants continue to aggressively market and sell the Optetrak Device, all the while maintaining that it is safe and effective for use in total knee replacements and concealing the true safety information related to these devices.

## JURISDICTION & VENUE

7.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332, because the amount in controversy exceeds Seventy-Five Thousand Dollars ($75,000.00), exclusive of interest and costs, and because there is complete diversity of citizenship between the Plaintiffs and all Defendants.

8.     The court has personal jurisdiction over Defendants because at all relevant times they have engaged in substantial business activities in the State of Maine. At all relevant times Defendants transacted, solicited, and conducted business in Maine through their employees, agents, and/or sales representatives, and derived substantial revenue from such business in Maine.

2

9.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391 because the Defendants have substantial, systematic, and continuous contacts in the State of Maine; because Plaintiff Keith Nuzzo was implanted with the defective Optetrak Device and was thereafter injured by the defective Optetrak Device in this judicial district; and because Defendants are subject to personal jurisdiction within the State of Maine.

## THE PARTIES

10.    Plaintiff Keith Nuzzo is an adult resident and citizen of Litchfield, Maine.

11.    Plaintiff Andrea Nuzzo is an adult resident and citizen of Litchfield, Maine.  At all times relevant to this action, Plaintiff Andrea Nuzzo was the lawful and loving spouse to Plaintiff Keith Nuzzo.

12.    Defendant Exactech, Inc. is a for-profit Florida corporation with its principal place of business at 2320 NW 66th Court, Gainesville, Florida, 32653.  Defendant Exactech, Inc.'s stated business purpose is to "develop, manufacture, market, distribute and sell orthopedic implant devices, related surgical instrumentation and biologic services to hospitals and physicians in the United States and internationally" and to introduce its products, including the Optetrak Device, into interstate commerce, either directly or indirectly through third parties or related entities. At all times relevant to this action, Defendant Exactech, Inc. tested, studied, researched, designed, formulated, manufactured, inspected, labeled, packaged, promoted, advertised, marketed, distributed, and/or sold the Optetrak Device in interstate commerce and throughout the State of Maine and generated substantial revenue as a result.

13.    Defendant Exactech US, Inc., a wholly owned subsidiary of Defendant Exactech, Inc., is a for-profit Florida corporation with its principal place of business at 2320 NW 66th Court, Gainesville, Florida, 32653. According to public filings, Defendant Exactech US, Inc. conducts Defendant Exactech Inc.'s sales and distribution activities in the United States. Defendant Exactech U.S., Inc. is engaged in the business of designing, developing, testing, assembling,

manufacturing, packaging, labeling, preparing, distributing, marketing, supplying, warranting, selling, and introducing its products, including the Optetrak Device, into interstate commerce, either directly or indirectly through third parties or related entities. At all times relevant to this action, Defendant Exactech US, Inc., tested, studied, researched, designed, formulated, manufactured, inspected, labeled, packaged, promoted, advertised, marketed, distributed, and/or sold the Optetrak Device in interstate commerce and throughout the State of Maine and generated substantial revenue as a result.

14.     At all relevant times to this action, each of the Defendants and their directors and officers acted within the scope of their authority of each Defendant and on behalf of each other Defendant.  At all times relevant to this action, Defendants possessed a unity of interest between themselves and exercised control over their subsidiaries and affiliates.  As such, the Defendants are each individually, as well as jointly and severally, liable to Plaintiffs for Plaintiffs' injuries, losses and damages as described herein.

## MISNOMER/ALTER-EGO

15.     In the event any parties are misnamed or not included herein, it is Plaintiffs' contention that such a misnomer and/or such parties are/were "alter egos" of parties named herein. Alternatively, Plaintiffs contend that such "corporate veils" should be pierced to hold such parties properly included in the interest of justice.

## GENERAL FACTUAL ALLEGATIONS

### A.     Knee Replacement Surgery and Artificial Knee Devices

16.     The knee is the largest joint in the human body, consisting of three individual bones: the shin bone (tibia), the thigh bone (femur), and the knee-cap (patella). The knee joint is lined with cartilage to protect the bones from rubbing against each other. This ensures that the joint surfaces can glide easily over one another. The human knee is a complicated joint which supports

the entire body weight on four small surfaces through a variety of motions essential to everyday life. It is also the joint most susceptible to arthritis.

17.     With the increases in lifespan, people have begun to suffer pain and disability from knee joint arthritis at significant rates.  Total knee arthroplasty ("TKA"), also called total knee replacement ("TKR"), are surgeons that are intended to relieve pain, improve joint function, and replace bones, cartilage and/or tissue that have been compromised by arthritis, other diseases, or trauma.  The knee replacement implants designed and cleared in the 1990s met the goals of reducing pain and restoring function with low failure rates.  As TKAs became more common, particularly among younger patients who want to maintain a physically active lifestyle, alternative bearing surfaces such as cross-linked polyethylene have been developed to address the issue of wear.

18.     During TKA procedures, surgeons replace the joint surfaces and damaged bone and cartilage with artificial materials, such as the Optetrak Device. The femoral implant is placed into the distal femur using surgical bone cement.  The tibial tray is also placed with surgical bone cement.  A polyethylene insert or liner is placed between the femoral implant and tibial try to asct as a cushion between the components.  The replacement redistributes weight and removes the tissue and/or bone causing inflammation, and thus reduces pain while improving the joint's function. Replacement requires a mechanical connection between the bones and the implant components.

   **B.     Defendants' Optetrak Knee Devices**

19.     The first Optetrak knee device was introduced to orthopedic surgeons in the United States in 1994, building upon technology licensed from the Hospital for Special Surgery

5

in New York City. The Optetrak design team "recognized that surgeons are often reluctant to experiment with "new" knee designs.

20.     Since 1994, Defendants have obtained fast-tracked 510(k) clearance from the United States Food and Drug Administration ("FDA") for various subsequent versions of Optetrak devices and tibial inserts, including the Optetrak Comprehensive Total Knee System and the Optetrak Logic Comprehensive Knee System.

21.     At all times material hereto, Defendants designed, developed, tested, assembled, selected, manufactured, packaged, labeled, prepared, distributed, marketed, supplied, warranted, and/or sold both the Optetrak Comprehensive Total Knee System and the Optetrak Logic Comprehensive Knee System throughout the United States.

22.     The Optetrak Device is classified as a knee join patellofemorotibial polymer/metal/polymer semi-constrained cemented prosthesis.  It features a mix of polyethylene and metal-based components.



23.     The Optetrak Device is comprised of the following parts: a patellar cap, femoral cap, tibial insert and tibial tray, as shown above. The patellar cap and tibial insert are made of polyethylene.

24.     As of 2012, the Defendants were utilizing a proprietary Net Compression Molded ("NCM") conventional polyethylene instead of cross-linked polyethylene ("XLPE") in the Optetrak Device.

25.     The Defendants claim that the Optetrak Device's longevity is a function of using proprietary NCM inserts in the total knee system.

26.     Defendants touted the Optetrak Device as being first-in-class in their product brochures.

27.     In their marketing materials, the Defendants promised that the Optetrak Device had excellent long-term clinical outcomes and that "surgeons and patients can have every confidence in the performance and longevity of the Optetrak knee system."

28.     However, in studies published in 2012 and 2016, the Optetrak total knee system performed poorly when compared to its competitors.[1] The Australian Registry, a preeminent, internationally recognized orthopedic implant registry, identified the Optetrak as an implant with a higher-than-expected rate of revision.

29.     Defendants promoted their Optetrak devices as a system with nearly three decades of clinical success and proven outcomes for patients around the world because of an improved articular design resulting in low polyethylene stresses.

30.     At all times relevant, Defendants have been aware of a high rate of early failures

---

[1] *See* Thelu, C. et al., Orthopedics and Traumatology 2012; 98:413-420; *see also* Australian Orthopaedic Association, National Joint Replacement Registry, Hip Knee & Shoulder Arthroplasty, 2016 Annual Report.

with Optetrak knee systems which required recipients of the Optetrak Device to undergo revision surgeries to remove the defective device.

31.     Despite actual knowledge of the increased risk of failure related to the defective nature of the Optetrak Device, Defendants made the decision not to recall, stop selling, or otherwise change the warnings for the affected devices until there was a suitable replacement approved for the U.S. market.

32.     Despite Defendants' knowledge of early onset failures of the Optetrak Device, Defendants continued to manufacture, promote, and distribute the Optetrak Device without alerting surgeons of the potential increased risks of early onset failures of the Optetrak Device.

33.     Despite Defendants' knowledge of early onset failures of the Optetrak Device, Defendants continued to manufacture, promote, and distribute the Optetrak Device without changing, modifying, or improving the Optetrak Device to address the increased risk of early failure.

34.     Despite Defendants' knowledge of early onset failures of the Optetrak Device, Defendants never changed the labeling, marketing materials or product inserts to adequately and accurately warn patients or physicians of the associated increased risks, longevity, and alternative product options manufactured by Defendants or other companies with lesser risks and rates of early failure.

35.     Despite Defendants' knowledge of early onset failures of the Optetrak Device, Defendants never alerted the FDA of the known increased risks.

36.     By 2012, Defendants had further clinical evidence that Optetrak knee implants were failing at a rate higher than promoted. Reports in the Manufacturer and User Facility Device Experience (MAUDE) indicate instances of revision due to "loose tibial component", "aseptic

8

loosening", "pain and visible loosening", "polyethylene deformation", "polyethylene worn", and "pain, limited mobility, knee swelling and sensitivity" due to "loose" joint. These early onset failure mode reports are representative of the increased rate of incidents of which Defendants had become internally aware.

37.     In 2013, complaints continued to be reported. Some examples include revision for "tibial loosening" just two years postoperatively, "revision due to tibial loosening", "during revision, the tibial component was found to be loose and easily removed", "revision of knee component due to loosening", "revision due to pain and loosening."

38.     The complaints of early onset failures continued in 2014. Some examples include "revision due to tibial loosening", "tibial loosening", "revision of optetrak knee components due to tibial loosening", "revision due to pain and loosening", "revision of optetrak knee components due to aseptic loosening", several reports described as "revision of knee components due to tibial loosening", and "revision of optetrak knee components reportedly due [to] aseptic loosening".

39.     In the year 2015, Defendants did over $241 million in sales across all product lines. Defendants state in a 2015 Form 10-K, "to better meet the demand for revision surgeries, we began the initial launch of a new revision knee system in 2015."

40.     In 2015, of the more than $241 million in Defendants' total sales, knee device sales accounted for over $70 million in sales, or 29.3% of all Defendants' sales in 2015.

41.     In 2016, Defendants' revenue increased by 7% up to $257.6 million with knee devices sales increasing 4%. Knee device sales for the fourth quarter of 2016 accounted for $19.8 million of this amount.

42.     According to Exactech's then Chief Executive Officer and President David Petty, the increases in knee device revenue "reflect excellent surgeon acceptance of Exactech

innovations, including our three new revision systems." Mr. Petty further stated that he anticipated the "revision knee rollout in the fourth quarter" of 2016 will "carry momentum into 2017."

43.     On February 23, 2017, the Defendants received fast-tracked 510(k) clearance for a new Exactech knee implant, called "Truliant," which in an intentional non-cemented implant system.

44.     Shortly thereafter in 2017, the Defendants began a pilot program for the Truliant Total Knee System, which they offered as an improved upgrade to the Optetrak Comprehensive Total Knee System.

45.     Despite Defendants' claims in its promotional materials of over thirty years of successful outcomes with knee devices, Defendants knew, at all times relevant, of an unacceptably high early failure rate of its Optetrak knee implants.

46.     Upon information and belief, Defendants have never conducted a clinical trial on the Optetrak Device.

47.     Had Defendants conducted clinical trials of the Optetrak Device before the device was first released on the market, they would have discovered at that time the device's propensity to undergo substantial early polyethylene wear, component loosening and/or other failure causing serious complications including tissue damage, osteolysis, and other injuries as well as the need for revision surgery in patients.

48.     At all times relevant to this action, Defendants were aware of the problems with the Optetrak Device's design and its propensity to undergo substantial early polyethylene wear, component loosening and/or other failure causing serious complications including tissue damage, osteolysis, and other injuries as well as the need for revision surgery in patients. Nonetheless, Defendants still did not adequately warn patients, the medical community, or the public about

10

these risks, and continued and continue to present day to promote, market, sell and defend the Optetrak Device.

49.     At all times relevant to this action, Defendants failed to recognize the defects in the Optetrak Device due to poor and inadequate quality assurance procedures, including the failure to implement appropriate physical, manual, x-ray, microscopic and other inspections of the Optetrak Device. Defendants also failed to implement or utilize adequate safeguards, tests, inspections, validation, monitoring and quality assessments to ensure the safety of the Optetrak Device.

50.     At the time the Optetrak Device was manufactured and sold to patients, including Plaintiff, the device was defectively manufactured and unreasonably dangerous, and did not conform to the federal regulations subjecting patients to unreasonable risks of injury.

51.     At all times relevant to this action, Defendants' inadequate manufacturing processes also led to material flaws in the quality systems at its manufacturing facilities.

52.      During the course of designing and manufacturing the Optetrak Device, Defendants failed in several ways, including, without limitation, by:

> a.     failing to conduct adequate mechanical testing, including fatigue or other wear testing, on components, subassemblies and/or the finished Optetrak Device;
>
> b.     failing to test an adequate number of sample devices on an ongoing basis;
>
> c.     failing to take adequate steps to specifically identify failure modes with clarity and to suggest methods to monitor, avoid, and/or prevent further failures;
>
> d.     failing to identify and/or note the significance of any testing that resulted in failure of the Optetrak Device;

11

e.      failing to take corrective actions to eliminate or minimize further failures of the Optetrak Device;

f.      failing to adequately explain performance specifications for the components, subassemblies, and/or finished Optetrak Device;

g.      failing to adequately explain or justify all test conditions and acceptance criteria for the Optetrak Device;

h.      failing to perform adequate testing in an environment that adequately simulated in vivo conditions; and

i.      failing to perform adequate quality assurance testing before and after sterilization.

53.     At all times relevant to this action, Defendants failed to perform adequate testing of the Optetrak Device, including its components and subassemblies, to ensure that the Optetrak Device functioned properly during and after implantation.

54.     As a result of these manufacturing and quality control problems associated with the manufacture of the Optetrak Device, the device was inadequately and defectively manufactured making it adulterated, and outside of the specifications expressly approved by the FDA.

55.     On or before the date of Plaintiff's initial knee replacement surgery, Defendants knew or should have known that the Optetrak Device was failing and causing serious complications after implantation in patients.  Such complications included, but were not limited to, catastrophic polyethylene wear including the deposition of plastic particulate wear debris throughout the knee, a high rate of component loosening, and overall early system failure resulting in tissue destruction, osteolysis, and other injuries causing severe pain, swelling, instability and dysfunction in the knee and leg necessitating revision surgery.

56.    Defendants, however, actively concealed the true information and spread false information through, among other things, marketing and promotional materials, advertisements, and communications and meetings with orthopedic surgeons and other healthcare providers.

57.    Before the date of Plaintiff's initial knee replacement surgery, Defendants knew or should have known that the Optetrak Device was defective and unreasonably dangerous to patients, that the product had an unacceptable failure and complication rate, and that the product had a greater propensity to undergo substantial early polyethylene wear, component loosening and/or other failure causing serious complications including tissue damage, osteolysis, and other injuries as well as the need for revision surgery in patients.

58.    Defendants had legal obligations to stop promoting, marketing, selling and defending the Optetrak Device.  Defendants should have taken steps to notify physicians who had implanted and continue to implant the Optetrak Device of its propensity to undergo substantial early polyethylene wear, component loosening and/or other failure causing serious complications including tissue damage, osteolysis, and other injuries as well as the need for revision surgery in patients.  Defendants should have attempted to convey this same information to patients who had been implanted with the Optetrak Device. Nevertheless, Defendants did not notify doctors or patients of the risks the Optetrak Device presented. Instead, Defendants purposefully concealed this material information, while using their sales representatives and other sales, marketing and promotional employees to market, promote, distribute, sell, and defend the Optetrak Device.

## SPECIFIC FACTUAL ALLEGATIONS

59.    On February 21, 2012, Plaintiff Keith Nuzzo underwent a right total knee replacement at St. Mary's Regional Medical Center in Lewiston, Maine.  The surgery was performed by Dr. Wayne Moody.

60.     During the procedure, an Optetrak Device was implanted utilizing the following components:

    a.     Optetrak Trapezoidal Tibial Tray, Catalog No. 204-04-34, Lot No. 1942962;

    b.     Optetrak Cruciate Retaining Tibial Insert, Catalog No. 200-63-13, Lot No. 1189347;

    c.     Optetrak Asymmetric Cruciate Retaining Cemented Femoral Component, Catalog No. 230-03-03, Lot No. 2130432;

    d.     Optetrak 3 Peg Patella, Catalog No. 200-02-38, Lot No. 2185733; and

    e.     Cemex bone cement, Catalog No. 1510/S, Lot No. AA4256.

61.     On February 28, 2012, Plaintiff Keith Nuzzo underwent a left total knee replacement at St. Mary's Regional Medical Center in Lewiston, Maine. The surgery was performed by Dr. Wayne Moody.

62.     During the procedure, a Optetrak Device was implanted utilizing the following components:

    a.     Optetrak Trapezoidal Tibial Tray, Catalog No. 204-04-34, Lot No. 2018052;

    b.     Optetrak Cruciate Retaining Tibial Insert, Catalog No. 200-63-11, Lot No. 1715041;

    c.     Optetrak Asymmetric Cruciate Retaining Cemented Femoral Component, Catalog No. 230-02-03, Lot No. 2129378;

    d.     Optetrak 3 Peg Patella, Catalog No. 200-02-38, Lot No. 1977902; and

    e.     Cemex bone cement, Catalog No. 13A2101, Lot No. AA4260.

14

63.     After initial recovery and for years after both replacement surgeries, Plaintiff Keith Nuzzo's Optetrak Devices performed as expected.

64.     In May 2016, Plaintiff Keith Nuzzo began to develop instability and pain in his replaced right knee. X-rays demonstrated new onset osteolysis. Bloodwork was negative for and ruled out infection.

65.     On August 23, 2016, Plaintiff Keith Nuzzo underwent revision of his failed right Optetrak Device secondary to polyethylene liner failure resulting in metallosis and subsequent tissue damage, osteolysis and loosening of the femoral and tibial components. The procedure was performed by Dr. Michael Newman at St. Mary's Regional Medical Center in Lewiston, Maine.

66.     On November 17, 2020, Plaintiff Keith Nuzzo underwent revision of his failed left Optetrak Device secondary to polyethylene liner failure resulting in metallosis and subsequent tissue damage, osteolysis and loosening of the femoral and tibial components. The procedure was performed by Dr. Michael Newman at St. Mary's Regional Medical Center in Lewiston, Maine.

67.     Despite undergoing the revision surgeries, Plaintiff Keith Nuzzo experiences daily pain and discomfort in his bilateral knees which limit his activities of daily living and recreation and impact his quality of life.

68.     As a direct, proximate and legal consequence of the defective nature of the Optetrak Device as described herein, Plaintiff Keith Nuzzo has suffered and continues to suffer permanent and debilitating injures and damages, including but not limited to, significant pain and discomfort; gait impairment; poor balance; difficulty walking; component part loosening; metallosis; soft tissue damage; infection; and other injuries presently undiagnosed, which all require ongoing medical care. As a further direct, proximate and legal consequence of the defective nature of the Optetrak Device, Plaintiff has sustained and will sustain future damages, including but not limited

15

to additional revision surgeries; cost of medical care; rehabilitation; home health care; loss of earning capacity; mental and emotional distress; and pain and suffering.

## THE FEDERAL REQUIREMENTS

69.     The Medical Device Amendments of 1976 to the Food Device Cosmetic Act established the current regulatory framework for medical devices.

70.     The MDA, in theory, requires medical devices like the Optetrak Device to undergo premarket approval by the FDA, a process which obligates the manufacturer to design and implement a clinical investigation and to submit the results of that investigation to the FDA.

71.     Premarket approval is a rigorous process that requires a manufacturer to submit what is typically a multivolume application that includes, among other things, full reports of all studies and investigations of the device's safety and effectiveness that have been published or should reasonably be known to the applicant; a full statement of the device's components, ingredients, and properties and of the principle or principles of operation; a full description of the methods used in, and the facilities and controls used for, the manufacture, processing, and when relevant, packing and installation of, such device; samples or device components required by the FDA; and a specimen of the proposed labeling.

72.     The FDA may grant premarket approval only if it finds that there is reasonable assurance that the medical device is safe and effective and must weigh any probable benefit to health from the use of the device against any probable risk of injury or illness from such use.

73.     A medical device on the market prior to the effective date of the MDA – a so-called "grandfathered" device – is not required to undergo premarket approval.  In addition, a medical device marketed after the MDA's effective date may bypass the rigorous premarket approval process if the device is "substantially equivalent" to a "grandfathered" pre-MDA device (i.e., a

device approved prior to May 28, 1976).

74.     This exception to premarket approval is known as "510(k) clearance" which only requires the manufacturer to notify the FDA under section 510(k) of the MDA of its intent to market a device at least 90 days prior to the device's introduction on the market, and to explain the device's substantial equivalence to a pre-MDA predicate device.  The FDA may then "clear" the new device for sale in the United States.

75.     510(k) clearance is distinct from the FDA's pre-market approval ("PMA") process in that clearance does not require clinical confirmation of safety and effectiveness and as such the manufacturer retains all liability for the assertions of safety and effectiveness.

76.     All the component parts comprising Plaintiff's Optetrak Device were cleared for marketing by the FDA pursuant to 510(k) of the MDA or were marketed without receiving either 510(k) clearance or PMA approval by the FDA.

77.     According to the U.S. Supreme Court in *Buckman v. Plaintiffs' Legal Comm.*, 531 U.S. 341, 346 (2001), the Supreme Court explained that demonstrating that a device qualifies for this, known as the "§ 510(k) process," means that: "[s]ection 510(k) submissions must include the following: 'Proposed labels, labeling, and advertisements sufficient to describe the device, its intended use, and the directions for its use,' 21 CFR § 807.87(e) (2000); and must include "[a] statement indicating the device is similar to and/or different from other products of comparable type in commercial distribution, accompanied by data to support the statement," § 807.87(f); "[a] statement that the submitter believes, to the best of his or her knowledge, that all data and information submitted in the premarket notification are truthful and accurate and that no material fact has been omitted," § 807.87(k); and "any additional information regarding the device requested by the [FDA] Commissioner that is necessary for the Commissioner to make a finding

17

as to whether or not the device is substantially equivalent to a device in commercial distribution," § 807.87(l).

78.     The FDCA requires cleared medical devices to be demonstrated to be safe and effective for each intended use.[2]  Not only is the medical device itself part of the 510(k) process, but so is the labeling and packaging that comes with it.

79.     A manufacturer is required to give adequate directions for the use of a medical device such that a "layman can use a device safely and for the purposes for which it is intended"[3], and conform to section 801.15 requirements governing the appearance of the label.

80.     The FDCA requires medical device manufacturers to disclose all material facts in advertising and labeling.[4]  False and misleading labeling is considered misbranding[5], which is prohibited.[6]

81.     The distribution of a "misbranded" medical device is prohibited pursuant to 21 U.S.C. §§ 331(a), (k) (2012) and 21 U.S.C. § 352(f) (2012).

82.     The FDCA provides that a medical device is misbranded if, among other things, the labeling did not contain adequate directions for use, which includes critical information about adverse events. Adequate directions for use cannot be written including adverse events when the manufacturer has failed to disclose those adverse events to the FDA. Therefore, the labeling becomes inadequate and the product is misbranded.

---

[2] 21 U.S.C. § 360e(c)(2)(A)(iv) (2012).
[3] 21 C.F.R. § 810.5 (2012).
[4] 21 U.S.C. § 321(n) (2012).
[5] 21 U.S.C. § 321(a), q(1) (2012).
[6] 21 U.S.C. § 331(b).

83.   Federal law requires a manufacturer to ensure that any warranty statements it voluntary makes are truthful, accurate, not misleading, and consistent with applicable federal and state law.[7]

84.   Under the FDCA, medical device manufacturers are prohibited from introducing the adulteration or misbranding of any medical device into interstate commerce.[8]

### A.   The FDA, By Its Regulations and 510(k) Clearance Process, Prohibits Misleading or False Promotional and Marketing Activities

85.   The FDA regulates the manufacture, sale, and distribution of medical devices in the United States under the authority of the FDCA. This authority includes oversight of labeling and advertising for all medical devices.[9]

86.   Under the FDCA and FDA's implementing regulations, labeling, promotional advertisements, and making claims about medical devices are deemed misleading if they omit or ignore certain information about the product's risks.

87.   A medical device shall be deemed to be misbranded if its labeling is false or misleading in any way. Labeling or advertising may be considered misleading if it fails to reveal material facts about the product being promoted, including facts about the consequences that can result from use of the product as suggested in a promotional piece.[10]

### B.   After a Medical Device is Cleared via the 510(k) Process, a Device Manufacturer Still Has Requirements, Including General Reporting Requirements, to the FDA Mandated by Federal Regulations

---

[7] 21 U.S.C. § 331(b) (effective 2013).
[8] *Id.*
[9] See 21 U.S.C. § 352(a), (n), (q) & (4) (2012).
[10] 21 U.S.C. § 321(n) (2012); 21 C.F.R. §§ 1.21, 202.1(e)(5)(iii) (2012).

88.     A manufacturer's obligations do not end with 510(k) clearance by the FDA.  Even after clearance, manufacturers are required to report to the FDA "no later than 30 calendar days after the day: the manufacturer receive[s] or otherwise become[s] aware of information, from any source, that reasonably suggests that a device" marketed by the manufacturer:

     a.     May have caused or contributed to death or serious injury; or

     b.     Has malfunctioned and this device or a similar device [likewise marketed by the manufacturer] would be likely to cause or contribute to a death or serious injury, if the malfunction were to recur.[11]

89.     These reports must contain all information reasonably known to the manufacturer, including any information that can be obtained by analysis, testing, or other evaluation of the device, and any information in the manufacturer's possession.

90.     In addition, manufacturers are responsible for conducting an investigation of each adverse event and must evaluate the cause of the adverse event.[12]

91.     Manufacturers are required to make periodic reports to the FDA regarding cleared devices, such reports to include summaries of:

     a.     Unpublished reports of data from any clinical investigations or nonclinical laboratory studies involving the device or related devices and known to or that reasonably should be known to the applicant; and,

     b.     Reports in the scientific literature concerning the device and known to or that reasonably should be known to the applicant.[13]

---

[11] 21 C.F.R. § 803.50(a) (2012); 21 U.S.C. § 360i(a) (2012).
[12] 21 C.F.R. § 803.50(b)(3).
[13] 21 C.F.R. § 814.84(b)(2) (2012).

92.     The medical device manufacturer has a continuing duty to monitor the product after FDA clearance and to discover and report to the FDA any complaints about the product's performance and any adverse health consequences of which it became aware and that are or may be attributable to the product.

93.     The manufacturer is obligated to inform the FDA of new clinical investigations or scientific studies concerning the device about which the manufacturer knows or reasonably should know.[14]

94.     The FDA can revoke its clearance based on these post-approval reports.[15]

95.     The manufacturer must establish internal procedures for reviewing complaints and adverse event reports.[16]  Medical device manufacturers are required by federal regulation to "establish and maintain" an adverse event database.[17]  Pursuant to federal regulations, manufacturers of medical devices must also describe in every individual adverse event report whether remedial action was taken with regard to the adverse event, and whether the remedial action was reported to FDA as a removal or correction of the device.[18]

96.     Federal law also mandates that the FDA establish regulations requiring manufacturer of a medical device to report promptly to FDA any correction or removal of a device undertaken to reduce a risk to health posed by the device, or to remedy a violation of federal law by which a device may present a risk to health.[19]

---

[14] *Id*.
[15] 21 U.S.C. §§ 360(e)(1), 360(h)(e) (2012).
[16] 21 C.F.R. § 820.198(a) (2012).
[17] 21 C.F.R. § 803.1(a) (2012).
[18] 21 C.F.R. § 803.52 (2012).
[19] 21 U.S.C. § 360(i).

97.     Manufacturers must disclose any reportable MDR event or events, including a trend analysis that necessitates remedial action to prevent an unreasonable risk of substantial harm to the public health, to the FDA within 5 business days after becoming aware of such event or events.[20]

98.     Device manufacturers must report promptly to FDA any device corrections and removals, and maintain records of device corrections and removals.

99.     FDA regulations require submission of a written report within ten (10) working days of any correction or removal of a device initiated by the manufacturer to reduce a risk to health posed by the device, or to remedy a violation of the Act caused by the device, which may present a risk to health.  The written submission must contain, among other things, a description of the event giving rise to the information reported, the corrective or removal actions taken, and any illness or injuries that have occurred with use of the device, including reference to any device report numbers.  Manufacturers must also indicate the total number of devices manufactured or distributed which are subject to the correction or removal, and provide a copy of all communications regarding the correction or removal.[21]

100.     Pursuant to federal regulation, manufacturers must comply with specific quality system requirements promulgated by FDA. These regulations require manufacturers to meet design control requirements, including but not limited to conducting design validation to ensure that devices conform to defined user needs and intended uses.

101.     Manufacturers must also meet quality standards in manufacture and production of the devices.

---

[20] See 21 C.F.R. § 806 (2012).
[21] See 21 C.F.R. § 806 (2012).

102.     Manufacturers must establish and maintain procedures for implementing corrective actions and preventive actions, investigate the cause of nonconforming products, and take corrective action to prevent recurrence.

103.     Manufacturers are also required to review and evaluate all complaints and determine whether an investigation is necessary.

104.     Manufacturers are also required to use statistical techniques, where necessary, to evaluate product performance.

105.     Defendants failed to comply with several of these requirements which led to the devices being on the market for use by Plaintiff's doctor.

106.     Defendants failed to comply with many of these above-mentioned FDA regulations and requirements.

107.     Defendants failed to report adverse events timely to the FDA.

108.     Defendants failed to investigate and correct problems with the Optetrak Device.

C.     **After Clearance of a Medical Device, The FDA, By Its Regulations and PMA Process, Requires A Manufacturer To Follow Good Manufacturing Practices**

109.     Under 21 C.F.R. § 820.1(a) (2012) of the Quality System (QS) Regulation for Medical Devices, current good manufacturing practice (CGMP) requirements are set forth in this quality system regulation.  The requirements in this part govern the methods used in, and the facilities and controls used for, the design, manufacture, packaging, labeling, storage, installation, and servicing of all finished devices intended for human use.  The requirements in this part are intended to ensure that finished devices will be safe and effective and otherwise in compliance with the Federal Food, Drug, and Cosmetic Act (FDCA).  This part establishes basic requirements applicable to manufacturers of finished medical devices.

110.    21 C.F.R. § 820.5 (2012) "Quality Systems," the FDA regulations state, "Each manufacturer shall establish and maintain a quality system that is appropriate for the specific medical device(s) designed or manufactured, and that meets the requirements of this part."

111.    21 C.F.R. § 820.3(z)(2) (2012) "Design validation," means the manufacturer must establish objective evidence that device specifications conform with user needs and intended use(s)."

112.    21 C.F.R. § 820.22 (2012): "Quality Audit" states: "Each manufacturer shall establish procedures for quality audits and conduct such audits to assure that the quality system is in compliance with the established quality system requirements and to determine the effectiveness of the quality system."

113.    21 C.F.R. § 820.160(a) (2012): "Distribution" states: "Each manufacturer shall establish and maintain procedures for control and distribution of finished devices to ensure that only those devices approved for release are distributed and that purchase orders are reviewed to ensure that ambiguities and errors are resolved before devices are released for distribution."

114.    21 C.F.R. § 820.170(a) (2012): "Installation" states: "Each manufacturer of a device requiring installation shall establish and maintain adequate installation and inspection instructions, and where appropriate test procedures. Instructions and procedures shall include directions for ensuring proper installation so that the device will perform as intended after installation. The manufacturer shall distribute the instructions and procedures with the device or otherwise make them available to the person(s) installing the device."

115.    21 C.F.R. § 803 (2012), states: "Manufacturers must include information that is reasonably known to the manufacturer, timely make Medical Device Reporting ("MDR")

24

submissions, define the procedures for implementing corrective and preventative actions, and review sampling methods for adequacy of their intended use."

116.    21 C.F.R. § 820.100 (2012) "Corrective and Preventive Action" states: (a) [e]ach manufacturer shall establish and maintain procedures for implementing corrective and preventive action.  The procedures shall include requirements for:

      a.     Analyzing processes, work operations, concessions, quality audit reports, quality records, service records, complaints, returned product, and other sources of quality data to identify existing and potential causes of nonconforming product, or other quality problems. Appropriate statistical methodology shall be employed where necessary to detect recurring quality problems;

      b.     Investigating the cause of nonconformities relating to product, processes, and the quality system;

      c.     Identifying the actions needed to correct and prevent recurrence of nonconforming product and other quality problems;

      d.     Verifying or validating the corrective and preventive action to ensure that such action is effective and does not adversely affect the finished device; an

      e.     Implementing and recording changes in methods and procedures needed to correct and prevent identified quality problems.

**D.**    **Defendants' Conduct in Violation of the FDCA**

117.    Defendants violated these FDCA statutes and accompanying regulations by:

      a.     falsely and misleadingly promoting the Optetrak Device;

      b.     failing to report adverse events to the FDA;

c.      failing to timely conduct failure investigations and analysis;

d.      failing to timely report any and all information concerning product failures and corrections;

e.      failing to timely and fully inform FDA of unanticipated adverse effects, increases in the incidence of adverse effects, and device failures necessitating a labeling, manufacturing or device modification;

f.      failing to conduct necessary design validation;

g.      selling and distributing a misbranded and adulterated product through interstate commerce; and

h.      failing to immediately disclose adverse effects of the Optetrak Device after implantation in patients.

118.    Defendants' violation of these FDCA statutes and accompany regulations, as discussed above, constitutes violation of the state law tort causes of action alleged in this Complaint, as set forth herein.

119.    Defendants' violation of the FDCA statutes and accompany regulations, as discussed above, directly caused or significantly contributed to the use of the Optetrak Device in Plaintiff and Defendants' misconduct in this regard thus directly caused or contributed to Plaintiff's injuries and damages.

**FIRST CAUSE OF ACTION**
**STRICT LIABILITY – DESIGN DEFECT**

120.    Plaintiffs hereby incorporate by reference all previous paragraphs of this Complaint as if fully set forth herein and further allege as follows:

26

121.    Prior to, on, and after the dates of Plaintiff's initial knee surgery, and at all times relevant to this action, Defendants tested, studied, researched, designed, formulated, manufactured, inspected, labeled, packaged, promoted, advertised, marketed, distributed, and/or sold the Optetrak Device for implantation into consumers, such as Plaintiff, by physicians and orthopedic surgeons in the United States.

122.    The Optetrak Device was defective in design and unreasonably dangerous when it entered the stream of commerce and was received by Plaintiff, because the risks were outweighed by any utility of the design of the device and because the device was dangerous to an extent beyond that which would be contemplated by the ordinary consumer.  At no time did Plaintiff have reason to believe that the Optetrak Device was in a condition not suitable for its proper and intended use.

123.    The Optetrak Device was defective in design and unreasonably dangerous when it entered the stream of commerce and was received by Plaintiff, because the foreseeable risks exceeded or outweighed the purported benefits associated with the device.

124.    At all times relevant to this action, the Defendants tested, studied, researched, designed, formulated, manufactured, inspected, labeled, packaged, promoted, advertised, marketed, distributed, and/or sold the Optetrak Device, which was implanted in Plaintiff, such that it was dangerous, unsafe, and defective in design.

125.    The Optetrak Device implanted in Plaintiff was defective in design by virtue of its size, shape, length, diameter, surface finish, molecular weight and/or materials which cause the device to have a propensity to undergo substantial early polyethylene wear, component loosening and/or other failure causing serious complications including tissue damage, osteolysis, and other injuries as well as the need for revision surgery in patients, and cause or contribute to a higher failure rate and/or shorter useful life expectancy than comparable hip replacement products.

126.    Plaintiff's physicians employed the Optetrak Device in the manner in which it was intended to be used, making such use reasonably foreseeable to Defendants.

127.    The Optetrak Device as tested, studied, researched, designed, formulated, manufactured, inspected, labeled, packaged, promoted, advertised, marketed, distributed, and/or sold by Defendants reached Plaintiff without substantial change in its condition.

128.    At all times herein mentioned, the Defendants tested, studied, researched, designed, formulated, manufactured, inspected, labeled, packaged, promoted, advertised, marketed, distributed, and/or sold the Optetrak Device, which was implanted in Plaintiff, such that it was dangerous, unsafe, and defective.  The defects in design include but are not limited to the following respects:

      a.    that the Optetrak Device has propensity to undergo substantial early polyethylene wear, component loosening and/or other failure causing serious complications including tissue damage, osteolysis, and other injuries as well as the need for revision surgery in patients;

      b.    that the materials used within the Optetrak Device were of an inferior grade or quality than advertised and promoted by Defendants;

      c.    that the Defendants failed to conduct adequate mechanical testing, including wear or other testing, on components, subassemblies and/or the finished Optetrak Device;

      d.    that Defendants failed to test an adequate number of samples of Optetrak Devices on an ongoing basis;

      e.    that Defendants failed to take adequate steps to specifically identify failure modes with the Optetrak Device with clarity and to suggest methods to monitor, avoid, and/or prevent further failures;

f.   that Defendants failed to identify and/or note the significance of any testing that resulted in failure of the Optetrak Device;

g.   that Defendants failed to take corrective actions to eliminate or minimize further failures of the Optetrak Device;

h.   that Defendants failed to adequately explain performance specifications for the components, subassemblies, and/or the finished Optetrak Device;

i.   that Defendants failed to adequately explain or justify all test conditions and acceptance criteria for the Optetrak Device;

j.   that Defendants failed to perform adequate testing in an environment that adequately simulated in vivo conditions;

k.   that Defendants failed to perform adequate testing of the Optetrak Device, including its components and subassemblies, to ensure that the Optetrak Device functioned properly during and after implantation;

l.   that Defendants failed to perform adequate testing on the specific Optetrak Device components which were intended to be sold to and implanted with consumers including Plaintiff and instead conducted testing with "dummy" parts designed and intended only for manufacturer testing purposes; and

m.   that Defendants failed to perform adequate quality assurance testing and validation before and after sterilization.

129.   As alleged herein, Defendants knew and had reason to know that the Optetrak Device caused an increased risk of harm to the Plaintiff and other consumers due to the device's propensity to undergo substantial early polyethylene wear, component loosening and/or other failure causing serious complications including tissue damage, osteolysis, and other injuries as

29

well as the need for revision surgery in patients. Defendants consciously disregarded this increased risk of harm by failing to adequately warn of the risk; unlawfully concealing the dangerous problems associated with implantation of the Optetrak Device; and continuing to market, promote, sell, and defend the Optetrak Device.

130.    As alleged herein, the defects in design of the Optetrak Device were a substantial factor in causing Plaintiff's injuries.

131.    Defendants failed to develop and make available alternative products that were designed in a safe or safer manner, even though such products were feasible and marketable and, in fact, were being sold and marketed by Defendants or other manufacturers at the time Defendants sold the Optetrak Device to Plaintiff Keith Nuzzo.

132.    As a direct, proximate and legal consequence of Defendants' wrongful conduct as described herein, including the defective design of the Optetrak Device, Plaintiff Keith Nuzzo has suffered and will continue to suffer permanent and debilitating injures and damages, including but not limited to, significant pain and discomfort; gait impairment; poor balance; difficulty walking; component part loosening; metallosis; soft tissue damage; infection; and other injuries presently undiagnosed, which all require ongoing medical care. As a further direct, proximate and legal consequence of the defective nature of the Optetrak Device, Plaintiff Keith Nuzzo has sustained and will sustain future damages, including but not limited to additional revision surgeries; cost of medical care; rehabilitation; home health care; loss of earning capacity; mental and emotional distress; and pain and suffering for which he is entitled to compensatory and equitable damages and declaratory relief in an amount to be proven at trial.

**SECOND CAUSE OF ACTION**
**STRICT LIABILITY – MANUFACTURING DEFECT**

133.    Plaintiffs hereby incorporate by reference all previous paragraphs of this Complaint as if fully set forth herein and further allege as follows:

134.    Prior to Plaintiff's initial knee surgery, and at all times relevant this action, Defendants tested, studied, researched, designed, formulated, manufactured, inspected, labeled, packaged, promoted, advertised, marketed, distributed, and/or sold the Optetrak Device for implantation into consumers, such as Plaintiff, by orthopedic surgeons in the United States.

135.    The Optetrak Device was "defective" and "unreasonably dangerous" when it entered the stream of commerce and was received by Plaintiff, because the risks were outweighed by any utility of the design of the device and because the device was dangerous to an extent beyond that which would be contemplated by the ordinary consumer.  At no time did Plaintiff have reason to believe that the Optetrak Device was in a condition not suitable for its proper and intended use.

136.    At all times herein mentioned, the Defendants tested, studied, researched, designed, formulated, manufactured, inspected, labeled, packaged, promoted, advertised, marketed, distributed, and/or sold the Optetrak Device, which was implanted in Plaintiff, such that it was dangerous, unsafe, and defective in manufacture.  The defects in manufacture include but are not limited to the following respects:

    a.    that the Optetrak Device has propensity to undergo substantial early polyethylene wear, component loosening and/or other failure causing serious complications including tissue damage, osteolysis, and other injuries as well as the need for revision surgery in patients;

    b.    that the materials used within the Optetrak Device were of an inferior grade or quality than advertised and promoted by Defendants;

c.      that the Optetrak Device as manufactured differed from Defendants' intended design or specifications, or from other typical units of the same product line;

d.      that the materials used within the Optetrak Device were not of the correct shelf age;

e.      that Defendants failed to measure and/or test an adequate number of samples of Optetrak Devices on an ongoing basis;

f.      that Defendants failed to take corrective actions to eliminate or minimize further failures of the Optetrak Device;

g.      that Defendants failed to perform adequate quality assurance testing and validation before and after sterilization.

137.    The manufacturing defects in the Optetrak Device existed when the device left the Defendants' control.

138.    Plaintiff Keith Nuzzo's physicians employed the Optetrak Device in the manner in which it was intended and recommended to be used, making such use reasonably foreseeable to Defendants.

139.    The Optetrak Device as tested, studied, researched, designed, formulated, manufactured, inspected, labeled, packaged, promoted, advertised, marketed, distributed, and/or sold by Defendants reached Plaintiff without substantial change in its condition.

140.    As alleged herein, Defendants knew and had reason to know that the Optetrak Device caused an increased risk of harm to the Plaintiff and other consumers due to the device's propensity to undergo substantial early polyethylene wear, component loosening, and/or other failure causing serious complications including tissue damage, osteolysis, and other injuries as

well as the need for revision surgery in patients. Defendants consciously disregarded thus increased risk of harm by failing to warn of such risks; unlawfully concealing the dangerous problems associated with implantation of the Optetrak Device; and continuing to market, promote, sell and defend the device.

141.   As alleged herein, the defects in manufacture of the Optetrak Device were a substantial factor in causing Plaintiffs' injuries.

142.   As a direct, proximate and legal consequence of Defendants' wrongful conduct as described herein, including the defective manufacture of the Optetrak Device, Plaintiff Keith Nuzzo has suffered and will continue to suffer permanent and debilitating injures and damages, including but not limited to, significant pain and discomfort; gait impairment; poor balance; difficulty walking; component part loosening; metallosis; soft tissue damage; infection; and other injuries presently undiagnosed, which all require ongoing medical care. As a further direct, proximate and legal consequence of the defective nature of the Optetrak Device, Plaintiff Keith Nuzzo has sustained and will sustain future damages, including but not limited to additional revision surgeries; cost of medical care; rehabilitation; home health care; loss of earning capacity; mental and emotional distress; and pain and suffering for which he is entitled to compensatory and equitable damages and declaratory relief in an amount to be proven at trial.

### THIRD CAUSE OF ACTION
### STRICT LIABILITY – FAILURE TO WARN

143.   Plaintiffs hereby incorporate by reference all previous paragraphs of this Complaint as if fully set forth herein and further allege as follows:

144.   Prior to, on, and after the dates of Plaintiff's initial knee surgery, and at all times relevant to this action, Defendants tested, studied, researched, designed, formulated, manufactured, inspected, labeled, packaged, promoted, advertised, marketed, distributed, and/or sold the Optetrak

Device for implantation into consumers, such as Plaintiff, by physicians and orthopedic surgeons in the United States.

145.    The Optetrak Device was defective and unreasonably dangerous when it entered the stream of commerce and was received by Plaintiff, because the risks were outweighed by any utility of the design of the device and because the device was dangerous to an extent beyond that which would be contemplated by the ordinary consumer.  At no time did Plaintiff have reason to believe that the Optetrak Device was in a condition not suitable for its proper and intended use.

146.    The Optetrak Device was defective and unreasonably dangerous when it entered the stream of commerce and was received by Plaintiff, because the warnings in the instructions for use, operative techniques, directions, marketing and promotional materials, advertisements, white papers, and other communications provided by Defendants or its sales force to physicians and patients with or about the Optetrak Device failed to adequately convey the potential risks and side effects of the Optetrak Device and the dangerous propensities of the device, which risks were known or were reasonably scientifically knowable to Defendants.  In particular, Defendants failed to adequately disclose the device's propensity to undergo substantial early polyethylene wear, component loosening and/or other failure causing serious complications including tissue damage, osteolysis, and other injuries as well as the need for revision surgery in patients which risks exceeded or outweighed the purported benefits associated with the device.

147.    The Optetrak Device was defective and unreasonably dangerous when it entered the stream of commerce and was received by Plaintiff, because the Optetrak Device posed increased risks of harm and side effects that were known or knowable to Defendants by the use of scientific knowledge available before, at and after the time of manufacture, distribution, and sale of the Optetrak Device to Plaintiff.

148.    Defendants knew or should have known of the defective condition, dangerous characteristics, and risks associated with the Optetrak Device as alleged herein.

149.    Defendants consciously disregarded the increased risks of harm by failing to adequately warn of such risks; unlawfully concealing the dangerous problems associated with implantation of the Optetrak Device; and continuing to market, promote, sell and defend the Optetrak Device.

150.    The Optetrak Device that was manufactured, distributed, and sold by the Defendants to Plaintiff was in a defective condition that was unreasonably dangerous to any user or ordinary consumer of the device, including Plaintiff.

151.    Such ordinary consumers, including Plaintiff, would not and could not have recognized or discovered the potential risks and side effects of the Optetrak Device as alleged herein.

152.    The Optetrak Device was expected to and did reach Plaintiff and Plaintiff's orthopedic surgeon without substantial change in its condition as manufactured, distributed, and sold by Defendants.

153.    Plaintiff's orthopedic surgeon used the Optetrak Device in the manner in which it was intended to be used, making such use reasonably foreseeable to Defendants.

154.    The lack of adequate and accurate warnings in the instructions for use, operative techniques, directions, marketing and promotional materials, advertisements, white papers, and other communications provided by Defendants or its sales force to physicians and patients with or about the Optetrak Device prior to, on, and after the dates of Plaintiff's initial knee surgery were a substantial factor in causing Plaintiff's injuries, losses and damages as alleged herein.

155.    Defendants failed to develop and make available alternative products that were designed in a safe or safer manner, even though such products were feasible and marketable and, in fact, were being sold and marketed by Defendants and/or other manufacturers at the time Defendants sold the Optetrak Device to Plaintiff.

156.    As a direct, proximate and legal consequence of Defendants' wrongful conduct as

described herein, including Defendants' lack of sufficient instructions or warnings, Plaintiff Keith Nuzzo has suffered and will continue to suffer permanent and debilitating injures and damages, including but not limited to, significant pain and discomfort; gait impairment; poor balance; difficulty walking; component part loosening; metallosis; soft tissue damage; infection; and other injuries presently undiagnosed, which all require ongoing medical care. As a further direct, proximate and legal consequence of the defective nature of the Optetrak Device, Plaintiff Keith Nuzzo has sustained and will sustain future damages, including but not limited to additional revision surgeries; cost of medical care; rehabilitation; home health care; loss of earning capacity; mental and emotional distress; and pain and suffering for which he is entitled to compensatory and equitable damages and declaratory relief in an amount to be proven at trial.

## FOURTH CAUSE OF ACTION
## NEGLIGENCE – DESIGN, MANUFACTURE & SALE

157.   Plaintiffs hereby incorporate by reference all previous paragraphs of this Complaint as if fully set forth herein and further allege as follows:

158.   Prior to, on, and after the dates of Plaintiff's initial knee surgery, and at all times relevant to this action, Defendants had a duty to exercise reasonable care in testing, study, research, design, formulation, manufacture, inspection, labeling, packaging, promotion, advertisement, marketing, distribution and sale of the Optetrak Device for implantation into consumers, such as Plaintiff, by physicians and surgeons in the United States.

159.   Prior to, on, and after the dates of Plaintiff's initial knee surgery, Defendants failed to exercise reasonable care and were negligent and careless in the testing, study, research, design, formulation, manufacture, inspection, labeling, packaging, promotion, advertisement, marketing, distribution and sale of the Optetrak Device.

160.   Prior to, on, and after the dates of Plaintiff's initial knee surgery, Defendants failed to perform adequate evaluation and testing of the Optetrak Device, where such adequate evaluation and testing would have revealed the device's propensity to undergo substantial early polyethylene

wear, component loosening and/or other failure causing serious complications including tissue damage, osteolysis, and other injuries as well as the need for revision surgery in patients.

161.     Prior to, on, and after the dates of Plaintiff's initial knee surgery, Defendants had received complaints from healthcare providers that the Optetrak Device caused serious complications including but not limited to polyethylene wear and/or other failure causing serious complications including component loosening, tissue damage, osteolysis, and the need for revision surgery in patients, but Defendants nonetheless consciously decided not to perform any further testing on the Optetrak Device; investigate the root cause of these complications; suspend sales and distribution of the device; or warn physicians and patients of the propensity of the Optetrak Device to undergo these failures.

162.     Defendants' failure to exercise reasonable care in the design, testing, distribution, manufacture, advertising, sales, and marketing prior to, on, and after the dates of Plaintiff's initial knee surgery was a substantial factor in causing Plaintiffs' injuries, losses, and damages, as alleged herein.

163.     As alleged herein, Defendants knew and had reason to know that the Optetrak Device caused increased risk of harm to Plaintiff and other consumers.  Defendants consciously disregarded this increased risk of harm by failing to warn of such risks; unlawfully concealing the dangerous problems associated with implantation of the Optetrak Device; and continuing to market, promote, sell and defend the Optetrak Device.

164.     As a direct, proximate and legal consequence of Defendants' wrongful conduct as described herein, including Defendants' failure to exercise reasonable care as described herein, Plaintiff Keith Nuzzo has suffered and will continue to suffer permanent and debilitating injures and damages, including but not limited to, significant pain and discomfort; gait impairment; poor balance; difficulty walking; component part loosening; metallosis; soft tissue damage; infection; and other injuries presently undiagnosed, which all require ongoing medical care. As a further

direct, proximate and legal consequence of the defective nature of the Optetrak Device, Plaintiff Keith Nuzzo has sustained and will sustain future damages, including but not limited to additional revision surgeries; cost of medical care; rehabilitation; home health care; loss of earning capacity; mental and emotional distress; and pain and suffering for which he is entitled to compensatory and equitable damages and declaratory relief in an amount to be proven at trial.

## FIFTH CAUSE OF ACTION
## NEGLIGENCE – FAILURE TO WARN

165.    Plaintiffs hereby incorporate by reference all previous paragraphs of this Complaint as if fully set forth herein and further allege as follows:

166.    Prior to, on, and after the dates of Plaintiff's initial knee surgery, and at all relevant times, Defendants tested, studied, researched, designed, formulated, manufactured, inspected, labeled, packaged, promoted, advertised, marketed, distributed, and/or sold the Optetrak Device for implantation into consumers, such as Plaintiff, by physicians and orthopedic surgeons in the United States.

167.    Prior to, on, and after the dates of Plaintiff's initial knee surgery, Defendants knew or should have known that the Optetrak Device was dangerous or was likely to be dangerous when used in a reasonably foreseeable manner.  Such danger included the device's propensity to undergo substantial early polyethylene wear, component loosening and/or other failure causing serious complications including tissue damage, osteolysis, and other injuries as well as the need for revision surgery in patients.

168.    Prior to, on, and after the dates of Plaintiff's initial knee surgery, Defendants knew or reasonably should have known that the users of the device, including Plaintiff, would not realize the dangers presented by the device.

169.    Prior to, on, and after the dates of Plaintiff's initial knee surgery, Defendants failed to adequately warn of the dangers presented by the device and/or failed to provide adequate and accurate instruction on the safe use of the device.  Such failures to warn and/or instruct included,

but were not limited to failing to advise of the known or knowable risks, dangers, and side effects associated with the use of the Optetrak Device; failing to properly advise of the means and methods available for the elimination of the risks, dangers, and side effects associated with the Optetrak Device; and failing to warn physicians and consumers about the risks, dangers, and side effects associated with the Optetrak Device, including the propensity to undergo substantial early polyethylene wear, component loosening and/or other failure causing serious complications including tissue damage, osteolysis, and other injuries as well as the need for revision surgery in patients.

170.   Reasonable manufacturers and distributors, under the same or similar circumstances prior to, on, and after the dates of Plaintiff's initial knee surgery, would have adequately warned of the dangers presented by the Optetrak Device, or provided adequate instructions for the safe use of the Optetrak Device.

171.   Prior to the dates of Plaintiff's initial knee surgery, the Optetrak Device had already caused numerous known reports of early device failure.  Defendants consciously decided neither to warn physicians or patients of the Optetrak Device's increased propensity to undergo substantial early polyethylene wear, component loosening and/or other failure causing serious complications including tissue damage, osteolysis, and other injuries as well as the need for revision surgery in patients.

172.   Defendants' negligent failure to warn Plaintiff, Plaintiff's orthopedic surgeon or Plaintiff's other healthcare providers prior to, on, and after the dates of Plaintiff's initial knee surgery was a substantial factor in causing Plaintiffs' injuries, losses and damages as described herein.

173.   As alleged above, Defendants knew and had reason to know that the Optetrak Device caused an increased risk of harm to Plaintiff and other consumers.  Defendants consciously disregarded this increased risk of harm by failing to warn of such risks; unlawfully concealing the

dangerous problems associated with implantation of the Optetrak Device; and continuing to market, promote, sell and defend the Optetrak Device.

174.    As a direct, proximate and legal consequence of Defendants' wrongful conduct as described herein, including Defendants' negligent failure to warn, Plaintiff Keith Nuzzo has suffered and will continue to suffer permanent and debilitating injures and damages, including but not limited to, significant pain and discomfort; gait impairment; poor balance; difficulty walking; component part loosening; metallosis; soft tissue damage; infection; and other injuries presently undiagnosed, which all require ongoing medical care. As a further direct, proximate and legal consequence of the defective nature of the Optetrak Device, Plaintiff has sustained and will sustain future damages, including but not limited to additional revision surgeries; cost of medical care; rehabilitation; home health care; loss of earning capacity; mental and emotional distress; and pain and suffering for which he is entitled to compensatory and equitable damages and declaratory relief in an amount to be proven at trial.

## SIXTH CAUSE OF ACTION
## NEGLIGENT MISREPRESENTATION

175.    Plaintiffs hereby incorporate by reference all previous paragraphs of this Complaint as if fully set forth herein and further allege as follows:

176.    At the time Defendants tested, studied, researched, designed, formulated, manufactured, inspected, labeled, packaged, promoted, advertised, marketed, distributed, and/or sold the Optetrak Device to Plaintiff, Defendants knew or should have known of the use for which the device was intended and the serious risks and dangers associated with such use of the Optetrak Device.

177.    Defendants owed a duty to orthopedic surgeons, other healthcare providers and to consumers of the Optetrak Device, including Plaintiff, to accurately and truthfully represent the risks of the Optetrak Device.  Defendants breached their duty by misrepresenting and/or failing to

adequately warn Plaintiff's orthopedic surgeon, the medical community, Plaintiff, and the public about the risks of the Optetrak Device, including the device's propensity to undergo substantial early polyethylene wear, component loosening and/or other failure causing serious complications including tissue damage, osteolysis, and other injuries as well as the need for revision surgery in patients, which Defendants knew or in the exercise of diligence should have known.

178.    Among Defendants' numerous misrepresentations and misleading omissions are Defendants' assurances that the Optetrak Device was safe, had an excellent performance record, and did not have a greater propensity to undergo substantial early polyethylene wear, component loosening and/or other failure causing serious complications including tissue damage, osteolysis, and other injuries as well as the need for revision surgery in patients.  Instead, and in Plaintiff's case, Defendants stated or implied to orthopedic surgeons, patients and the FDA that any problem with the Optetrak Device in a particular patient was attributable to "surgical technique" or patient factors such as body mass index, bone composition, and post-implantation activity level. Defendants made such statements even after they became aware of numerous and serious complications with the Optetrak Device.  Defendants did not reveal (and instead concealed) their knowledge of numerous and serious complications and other bad data during their meetings with orthopedic surgeons and the FDA.

179.    Despite their knowledge of serious problems with the Optetrak Device, Defendants urged their sales representatives to continue marketing the Optetrak Device, and distributed medical literature, white papers, non-peer reviewed studies, and other communications to surgeons in an effort to mislead them and the general public about the risks associated with the Optetrak Device and instead create the image and impression that the Optetrak Device was safe.

180.    As a direct, proximate and legal consequence of Defendants' wrongful conduct as described herein, including Defendants' negligent misrepresentations, Plaintiff Keith Nuzzo has suffered and will continue to suffer permanent and debilitating injures and damages, including but

not limited to, significant pain and discomfort; gait impairment; poor balance; difficulty walking; component part loosening; metallosis; soft tissue damage; infection; and other injuries presently undiagnosed, which all require ongoing medical care. As a further direct, proximate and legal consequence of the defective nature of the Optetrak Device, Plaintiff has sustained and will sustain future damages, including but not limited to additional revision surgeries; cost of medical care; rehabilitation; home health care; loss of earning capacity; mental and emotional distress; and pain and suffering for which he is entitled to compensatory and equitable damages and declaratory relief in an amount to be proven at trial.

## SEVENTH CAUSE OF ACTION
## INTENTIONAL MISREPRESENTATION

181.    Plaintiffs hereby incorporate by reference all previous paragraphs of this Complaint as if fully set forth herein and further allege as follows:

182.    Defendants, having undertaken to test, study, research, design, formulate, manufacture, inspect, label, package, promote, advertise, market, distribute and sell the Optetrak Device, owed a duty to provide accurate and complete information to Plaintiff, his orthopedic surgeon, and the public regarding the safety and efficacy of the Optetrak Device.

183.    However, Defendants misled Plaintiff, Plaintiff's orthopedic surgeon, and the public into believing that the Optetrak Device was safe and effective for use in total knee replacement surgery and engaged in deceptive, misleading and unconscionable promotional, marketing and sales tactics to convince orthopedic surgeons and patients to use the Optetrak Device, even though Defendants knew or should have known that the Optetrak Device was unreasonably dangerous as alleged herein.  Defendants also failed to warn orthopedic surgeons and the public about the serious risks associated with the use of the Optetrak Device including the device's propensity to undergo substantial early polyethylene wear, component loosening and/or other failure causing serious complications including tissue damage, osteolysis, and other injuries

42

as well as the need for revision surgery in patients.

184.    Defendants' advertising campaigns, marketing materials and promotional items, by containing affirmative misrepresentations and omissions, falsely and deceptively sought to create the image and impression that the Optetrak Device was safe for human use and had no unacceptable risks.

185.    Defendants purposefully concealed, failed to disclose, misstated, downplayed and understated the risks associated with the use of the Optetrak Device.  Defendants, through sales representatives, advertisements, and other marketing and promotional practices and communications as well as through the publication of medical literature including non-peer reviewed studies, deceived orthopedic surgeons, Plaintiff, other patients, and the public about the true risks of the Optetrak Device.  Defendants falsely and deceptively kept relevant information from orthopedic surgeons, the FDA and the public, including Plaintiff, regarding the safety of the Optetrak Device.

186.    Defendants expressly denied that the Optetrak Device created an increased risk of injury and took affirmative steps to prevent the discovery and dissemination of any evidence regarding the increased likelihood of injury from the Optetrak Device including but not limited to the device's propensity to undergo substantial early polyethylene wear, component loosening and/or other failure causing serious complications including tissue damage, osteolysis, and other injuries as well as the need for revision surgery in patients.

187.    Defendants did not accurately report the results of adverse events by fraudulently and intentionally withholding from the FDA, orthopedic surgeons, Plaintiff, and the public, the truth regarding Optetrak Device's failures for years, all the while undertaking sales, marketing and promotional campaigns to sell the Optetrak Device.  Defendants received reports of the Optetrak Device defects from various sources, including those alleged herein, and intentionally withheld this information from the FDA, orthopedic surgeons, Plaintiff, and the public, while continuing to

sell the Optetrak Device for implantation in patients such as Plaintiff.

188.     Further, even as Defendants disclosed some information regarding the Optetrak Device's defects, the disclosures were inadequate, incomplete, and misleading.

189.     Through their wrongful conduct, Defendants effectively deceived and misled the scientific and medical communities regarding the risks and benefits of the Optetrak Device. Defendants failed to fully inform orthopedic surgeons, Plaintiff, other patients and the public of the true risks associated with the Optetrak Device, defects that were known to Defendants, and continued to assure orthopedic surgeons and patients that the Optetrak Device was safe and effective for the purpose of continuing to derive substantial profits from the sale of the Optetrak Device.

190.     Through their advertising campaigns, sales and marketing materials and promotional items, Defendants falsely and deceptively misrepresented and omitted numerous material facts regarding the Optetrak Device, including but not limited to the device's propensity to undergo substantial early polyethylene wear, component loosening and/or other failure causing serious complications including tissue damage, osteolysis, and other injuries as well as the need for revision surgery in patients.

191.     Defendants possessed evidence demonstrating the Optetrak Device caused serious injuries.  Nevertheless, Defendants continued to market the Optetrak Device by providing false and misleading information about the device's safety and efficacy to Plaintiff and Plaintiff's orthopedic surgeon.

192.     Among Defendants' numerous misrepresentations and misleading omissions to Plaintiff, Plaintiff's orthopedic surgeon and the public were Defendants' assurances that the Optetrak Device was safe and had a low failure rate.  Defendants stated or implied to orthopedic surgeons that any problem with the Optetrak Device in a particular patient was attributable to "surgical technique" or patient factors such as body mass index, bone composition, and post-

44

implantation activity level.  Defendants made such statements even after they became aware of numerous and serious complications with the Optetrak Device.  Defendants did not reveal (and instead concealed) their knowledge of numerous and serious complications and other bad data during their meetings with orthopedic surgeons.

193.    Despite their knowledge of the risks with the Optetrak Device, Defendants urged their sales representatives to continue marketing the Optetrak Device and distributed medical literature including non-peer reviewed studies and other communications to orthopedic surgeons which did not adequately convey the risks of the Optetrak Device in an effort to mislead them and the public about the serious risks associated with the use of the Optetrak Device.

194.    Defendants engaged in all the acts and omissions alleged herein with the intent that Plaintiff and Plaintiff's orthopedic surgeon would rely on the misrepresentations, deceptions and concealments in deciding to implant and use the Optetrak Device rather than another of Defendants' products or competitors' products.

195.    Plaintiff and Plaintiff's orthopedic surgeon justifiably relied to their detriment on Defendants' intentional and fraudulent misrepresentations and this reliance proximately caused Plaintiff's injuries and damages as alleged herein.

196.    Plaintiff's orthopedic surgeon relied upon information obtained from Defendants, the medical literature, journal articles, medical conferences and presentations, adverse event reporting data, and discussions with other orthopedic specialists to get information about the performance and safety profile of medical devices including the Optetrak Device.  However, all these sources of information failed to include information about the true risks of the Optetrak Device because these risks, which were known to Defendants, were actively concealed or mispresented by Defendants.

197.    Had Defendants disclosed accurate, complete and truthful information about the device's propensity to undergo substantial early polyethylene wear, component loosening and/or

45

other failure causing serious complications including tissue damage, osteolysis, and other injuries as well as the need for revision surgery in patients, Plaintiff would not have allowed his orthopedic surgeon to implant the Optetrak Device into his body.

198.     As a direct, proximate and legal consequence of Defendants' wrongful conduct as described herein, including Defendants' deceptive, misleading and unconscionable promotional and sales methods, Plaintiff Keith Nuzzo has suffered and will continue to suffer permanent and debilitating injures and damages, including but not limited to, significant pain and discomfort; gait impairment; poor balance; difficulty walking; component part loosening; metallosis; soft tissue damage; infection; and other injuries presently undiagnosed, which all require ongoing medical care. As a further direct, proximate and legal consequence of the defective nature of the Optetrak Device, Plaintiff has sustained and will sustain future damages, including but not limited to additional revision surgeries; cost of medical care; rehabilitation; home health care; loss of earning capacity; mental and emotional distress; and pain and suffering for which he is entitled to compensatory and equitable damages and declaratory relief in an amount to be proven at trial.

## EIGHTH CAUSE OF ACTION
## <u>FRAUD</u>

199.     Plaintiffs hereby incorporate by reference all previous paragraphs of this Complaint as if fully set forth herein and further allege as follows:

200.     At the time Defendants sold the Optetrak Device to Plaintiff, Defendants were in a unique position of knowledge concerning the safety and effectiveness of the Optetrak Device, which knowledge was not possessed by Plaintiff or Plaintiff's health care providers, and Defendants thereby held a position of superiority over Plaintiff and Plaintiff's health care providers.

201.     Through their unique knowledge and expertise regarding the defective nature of the Optetrak Device, and through their statements to orthopedic surgeons, including Dr. Moody, and patients in advertisements, sales and marketing materials, promotional items, instructions for use,

product information, sales representatives and other communications, Defendants professed to Plaintiff and Dr. Moody that Defendants had knowledge of the truth of their representations that the Optetrak Device was safe and effective for its intended use and was not defective.

202.    Defendants' representations to Plaintiff and Plaintiff's health care providers, the FDA and the medical community were unqualified statements made to induce Plaintiff and Dr. Moody to purchase and use the Optetrak Device, and Plaintiff and Dr. Moody relied upon these statements to their detriment when purchasing the Optetrak Device and implanting the device into Plaintiff.

203.    In 2007 or early 2008, Dr. Moody began to complain to his sales distributor, Timothy O'Neill of Surgical Systems, Inc., that he was seeing an increasing number of patients experiencing significant tibial loosening involving one of Defendants' Optetrak products.

204.    Defendants responded to Dr. Moody explaining that he was the only surgeon reporting these failures and that the issue was not in Defendants' view due to a problem with the Optetrak product but with an issue related to Dr. Moody's technique for utilizing bone cement during total knee replacement. These statements were false as other orthopedic surgeons were reporting similar issues to Defendants at this same time.

205.    Despite these device failures and Defendants' attempts to blame his surgical technique, Dr. Moody continued to implant Defendants' hip replacement products.

206.    At this same time and in years prior, Defendants also paid Dr. Moody as a surgeon consultant to ensure his continued use of Defendants' hip replacement products.

207.    Defendants have made numerous material misrepresentations to Plaintiff, Dr. Moody, the FDA and the general public regarding the Optetrak Device.  The material misrepresentations included but are not limited to the following:

          a.    Defendants' assurances that the Optetrak Device was safe, had a low complication rate, and would not fail during normal, intended use;

b.    Defendants' assurances that any problem with the Optetrak Device in an individual patient was attributable to "surgical technique" or patient factors such as body mass index, bone composition, post-implantation activity level, and hypersensitivity; and

c.    Defendants' assurances that the Optetrak Device was not susceptible to an increased risk of premature failure causing serious complications including component loosening, tissue damage, osteolysis, and the need for revision surgery in patients.

208.   Defendants made such statements even after they became aware of numerous and serious complications with the Optetrak Device, particularly the device's propensity to undergo substantial early polyethylene wear, component loosening and/or other failure causing serious complications including tissue damage, osteolysis, and other injuries as well as the need for revision surgery in patients.  Defendants did not reveal (and instead concealed) their knowledge of these numerous and serious complications as well as other bad data during their meetings and communications with orthopedic surgeons, including Dr. Moody, and interactions with the FDA.

209.   Despite their knowledge of serious risks with the Optetrak Device, Defendants urged their sales representatives to continue marketing the Optetrak Device and distributed medical literature including non-peer reviewed studies and other communications to orthopedic surgeons, including Dr. Moody, in an effort to mislead them and the public about the risks and reasons for the Optetrak Device's failures.

210.   Defendants took unconscionable advantage of their superior knowledge and engaged in constructive fraud in their relationship with Plaintiff and Plaintiff's health care providers.  Plaintiff and Plaintiff's health care providers reasonably relied on Defendants' representations to their detriment as described herein.

211.   The information concealed and not adequately disclosed by Defendants to Plaintiff

48

and Plaintiff's health care providers were material facts that a reasonable person including Plaintiff would have and should have been able to consider when deciding whether to undergo knee replacement surgery and whether to use the Optetrak Device or another artificial knee device during the procedure.

212.    Defendants, by their misstatements and active concealment of material facts, intentionally prevented Plaintiff and Plaintiff's health care providers from obtaining material and necessary information about the effectiveness and safety or lack thereof of the Optetrak Device.

213.    As a direct, proximate and legal consequence of Defendants' wrongful conduct as described herein, including Defendants engaging in constructive fraud in their relationship with Plaintiff and Plaintiff's health care providers, Plaintiff Keith Nuzzo has suffered and will continue to suffer permanent and debilitating injures and damages, including but not limited to, significant pain and discomfort; gait impairment; poor balance; difficulty walking; component part loosening; metallosis; soft tissue damage; infection; and other injuries presently undiagnosed, which all require ongoing medical care. As a further direct, proximate and legal consequence of the defective nature of the Optetrak Device, Plaintiff has sustained and will sustain future damages, including but not limited to additional revision surgeries; cost of medical care; rehabilitation; home health care; loss of earning capacity; mental and emotional distress; and pain and suffering for which he is entitled to compensatory and equitable damages and declaratory relief in an amount to be proven at trial.

## NINTH CAUSE OF ACTION
## LOSS OF CONSORTIUM

214.    Plaintiffs hereby incorporate by reference all previous paragraphs of this Complaint as if fully set forth herein and further allege as follows:

215.    At all times relevant to this action, Plaintiff Andrea Nuzzo was the lawful and loving spouse of Plaintiff Keith Nuzzo.

49

216.     As a direct, proximate and legal consequence of Defendants' wrongful conduct as described herein, whether through strict liability or negligence, Plaintiff Andrea Nuzzo has suffered and will continue to suffer the loss of support, companionship, service, love, affection, society, intimate relations and other elements of consortium all to the detriment of their marital relationship for which Plaintiff Andrea Nuzzo is entitled to compensatory and equitable damages and declaratory relief in an amount to be proven at trial.

**TENTH CAUSE OF ACTION**
**<u>PUNITIVE DAMAGES</u>**

217.     Plaintiffs hereby incorporate by reference all previous paragraphs of this Complaint as if fully set forth herein and further allege as follows:

218.     Plaintiff is entitled to punitive damages because the Defendants' breaches of their duties to Plaintiffs were deliberate, intentional, and/or motivated by malice or ill will to Plaintiff.

219.     Defendants intentionally misled Plaintiff, Plaintiff's health care providers, the FDA, the medical community, and the public at large by making false representations about the safety and efficacy of the Optetrak Device.

220.     Defendants intentionally downplayed, understated and/or misrepresented their actual knowledge of the potential for serious injury with the use of Optetrak Device despite available information demonstrating that the Optetrak Device was likely to cause serious injuries to patients implanted with the device.

221.     Defendants were in possession of evidence demonstrating that the Optetrak Device caused serious injuries including the device's propensity to undergo substantial early polyethylene wear, component loosening and/or other failure causing serious complications including tissue damage, osteolysis, and other injuries as well as the need for revision surgery in patients. Nevertheless, Defendants continue to market the Optetrak Device by providing false and

misleading information to the Plaintiff, the FDA and the public with regard to the safety and efficacy of the device.

222.    Defendants' outrageous actions as described herein were performed willfully, intentionally, and with malice in their disregard for the rights of the Plaintiff and the general public.

223.    Accordingly, Plaintiff seeks and is entitled to punitive or exemplary damages in an amount to be determined at trial.

## TOLLING OF THE LIMITATIONS PERIOD

224.    Defendants, through its affirmative misrepresentations and omissions, actively concealed from Plaintiffs and Plaintiffs' health care providers the true and significant risks associated with the Optetrak Device.

225.    As a result of Defendants' actions, Plaintiffs and Plaintiff's health care providers were unaware, and could not have reasonably known or have learned through reasonable diligence, that Plaintiff had been exposed to the risks identified herein, and that those risks were the result of Defendants' acts, omissions, and misrepresentations.

226.    Accordingly, no limitations period ought to accrue until such time as Plaintiff knew or reasonably should have known of some causal connection between Plaintiff being implanted with the Optetrak Device and the resulting harm later suffered by Plaintiff as a result by reason of Defendants' fraudulent concealment.

227.    Additionally, Defendants are equitably estopped from asserting any limitations defense by virtue of their fraudulent concealment and other misconduct as described herein.

228.    Further, the limitations period ought to be tolled under principles of equitable tolling.

## CONDITIONS PRECEDENT

229.    All conditions precedent to Plaintiffs' right to recover herein and to Defendants' liability have been performed or have occurred.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs demand judgment against the Defendants, jointly and severally, as follows:

1.      Compensatory damages, in excess of the amount required for federal diversity jurisdiction and in an amount to fully compensate Plaintiffs for Plaintiffs' injuries and damages, both past and present;

2.      Special damages, in excess of the amount required for federal diversity jurisdiction and in an amount to fully compensate Plaintiffs for all of Plaintiffs' injuries and damages, both past and present, including but not limited to, past and future medical expenses, costs for past and future rehabilitation and/or home health care, lost income, loss of earning capacity, permanent disability, including permanent instability and loss of balance, pain and suffering, and loss of consortium;

3.      Punitive damages as allowed by law;

4.      Double or triple damages as allowed by law;

5.      Attorneys' fees, expenses, and costs of this action;

6.      Pre-judgment and post-judgment interest in the maximum amount allowed by law; and

7.      Such further relief as this Court deems necessary, just, and proper.

## JURY DEMAND

Plaintiff demands a trial by jury of all claims asserted in this Complaint.

Dated: July 15, 2021                          Respectfully submitted,

/s/ Kevin M. Fitzgerald
Kevin M. Fitzgerald, Maine Bar No. 9373
FITZGERALD LAW GROUP, LLC
120 Exchange Street, Suite 200
Portland, ME 04101
Telephone: (207) 874-7407
Facsimile: (207) 850-2120
Email: kfitzgerald@fitz-lawgroup.com

Adam H. Weintraub*
WEINTRAUB LAW, LLC
639 Loyola Avenue, Suite 2180
New Orleans, LA 70113
Telephone: (504) 656-6280
Facsimile: (504) 708-4512
Email: aweintraub@ahwfirm.com

*for pro hac vice admission

*Attorneys for Plaintiff*